UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KENDRA L. GOOD,                          )
                                         )
           Plaintiff,                    )
                                         )
     vs.                                 )   Case No. 4:15CV10 ACL
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
           Defendant.                    )

## MEMORANDUM AND ORDER

Plaintiff Kendra L. Good brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Good alleged that she was disabled because of degenerative arthritis, a disc bulge, carpal tunnel syndrome, depression, anxiety/panic attacks, fibromyalgia,[1] bulimia/anorexia, neck/back pain, and insomnia. (Tr. 228.)

An Administrative Law Judge (ALJ) found that, despite Good's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is

---

[1] A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution. Additionally, point tenderness must be found in at least 11 of 18 specified sites. *Stedman's Medical Dictionary*, 725 (28th Ed. 2006).

presented in the parties' briefs and is repeated here only to the extent necessary.

## I.  Procedural History

On September 9, 2011, Good filed an application for DIB, claiming that she became unable to work due to her disabling condition on September 8, 2011.   (Tr. 179-80).   Good's claim was denied initially.   (Tr. 121-23.)   Following an administrative hearing, Good's claim was denied in a written opinion by an ALJ, dated June 14, 2013.   (Tr. 23-36.)   Good then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on November 19, 2014.   (Tr. 1-6.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Good claims that the ALJ failed to properly weigh the medical evidence.   Good also argues that the ALJ failed to properly evaluate Good's credibility.

## II.  The ALJ's Determination

The ALJ found that Good met the insured status requirements of the Social Security Act on March 31, 2013, and that she has not engaged in substantial gainful activity from her alleged onset date of September 8, 2011 through her date last insured of March 31, 2013.   (Tr. 26.)

In addition, the ALJ concluded that Good's degenerative disc disease and depression were severe impairments.   *Id.*   The ALJ found that Good did not have an impairment or combination of impairments that meet/s or equal/s in severity the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 27.)

As to Good's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that, through the date last insured, the claimant had the
> residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b).   She is able to frequently perform fine and gross

> manipulation with [her] right upper extremity and has no limitation
> on her left upper extremity. The claimant should avoid
> concentrated exposure to vibration. The claimant is able to
> maintain focus and attention for two hour blocks of time. She is
> able to occasionally interact with the public, co-workers and
> supervisors. The claimant is capable of low stress work, with "low
> stress" defined as occasional decision-making and occasional
> changes in work setting. She is capable of work requiring
> occasional work-related judgment.

(Tr. 28-29.)

The ALJ found that Good's allegations regarding her limitations were not entirely credible. (Tr. 29.) The ALJ stated that Good's subjective allegations of pain were "wildly exaggerated when compared to the objective medical record," and noted that financial motivation appeared to be "quite strong in this case." (Tr. 31-32.)

The ALJ discussed the opinion evidence and indicated that she was assigning "no weight" to the opinions of treating physician Dr. John Vernon regarding Good's fibromyalgia because they were based on Good's subjective complaints, Dr. Vernon is not a rheumatologist, and there is no evidence Good has fibromyalgia. (Tr. 32.) The ALJ assigned "great weight" to the opinion of state agency physician Jeffrey Wheeler, M.D., as she found it was consistent with the medical record. *Id.* The ALJ also indicated she was giving "some weight" to the opinion of state agency psychologist Aine Kresheck, Ph.D., and "little weight" to the opinion of consultative psychologist David Lipsitz, Ph.D. (Tr. 32-33.)

The ALJ found that Good was unable to perform any past relevant work. (Tr. 34.) There were other jobs (electronics worker, packing line worker), however, that exist in significant numbers in the national economy that Good could perform. (Tr. 35.) The ALJ therefore concluded that Good has not been under a disability, as defined in the Social Security Act, from

September 8, 2011, through March 31, 2013, the date last insured.   (Tr. 36.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on September 9, 2011, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through March 31, 2013, the date last insured.

*Id.*

# III.   Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and

non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact

on her ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id.*   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to

perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related

activities.  *See id.*   Next, the Commissioner must determine the severity of the impairment based

on those ratings.   *See* 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the impairment is severe, the

Commissioner must determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§

404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical

findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the

appropriate mental disorders.   *See id.*   If there is a severe impairment, but the impairment does

not meet or equal the listings, then the Commissioner must prepare an RFC assessment.   *See* 20

C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## IV.   Discussion

As noted above, Good argues that the ALJ failed to properly weigh the medical opinion

evidence.   Good also argues that the ALJ failed to properly evaluate Good's credibility.   The

undersigned will discuss these claims in turn, beginning with the ALJ's credibility analysis.

## 1.       Credibility Analysis

Good argues that the ALJ's credibility determination is not supported by substantial

evidence.

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's

credibility.   *Wagner v. Astrue,* 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart,* 403 F.3d

953, 957 (8th Cir. 2005).   In doing so, an ALJ must consider the following factors: (1) the

claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating

and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any

functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical

evidence to support the claimant's complaints.   *Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir.

2011) (otherwise known as the *Polaski* factors from *Polaski v. Heckler,* 739 F.2d 1320, 1321–22 (8th Cir. 1984)).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. *Renstrom v. Astrue,* 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan,* 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Id. See also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel,* 152 F.3d 1056, 1059–60 (8th Cir. 1998). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Renstrom,* 680 F.3d at 1066 (internal quotation marks and citation omitted) (alteration in *Renstrom* ).

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner,* 646 F.3d at 558. Although an ALJ need not explicitly discuss each *Polaski* factor in her decision, she must at least acknowledge and consider the factors. *Renstrom,* 680 F.3d at 1067 ("The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints.").

The ALJ first discussed the objective medical evidence regarding Good's physical impairments and found that it did not support the severity alleged by Good. (Tr. 29-30.) The ALJ noted that a May 2009 lumbar spine MRI revealed mild disc protrusion at L4/L5 with no nerve impingement, and a May 2010 cervical spine MRI showed degenerative changes but no

stenosis.   (Tr. 29, 361.)   The ALJ pointed out that Good presented to Terrence Piper, M.D. on

January 26, 2010, with complaints of back pain from her neck to her feet, yet Dr. Piper indicated

Good's examination was normal.   (Tr. 30, 306.)   Dr. Piper stated that Good's MRI and x-rays

look "okay," revealing "a little bulge at 4-5, not bad."   (Tr. 306.)   Dr. Piper further stated as

follows:

> She said she was going for disability and she asked [Dr.] Vernon to
> write a form for disability, but he said no and to see me.   I think she
> is too good for disability at this point.   She is only 30.   Although
> she has some changes in her back, many of us have similar changes,
> if not worse, in the same age group.   I would be inclined not to
> support disability on her.   I would [advise] her to try some water
> type high buoyance type exercise for her core and also to get a
> stability work and to work on that for her core.   Maybe a Weight
> Watchers weight loss program should be implemented to lose a little
> weight.   All of those combined should help her with her low back.

*Id.*

Good began seeing John Vernon, M.D., beginning in May 2010, with complaints of pain

everywhere.   (Tr. 311-17.)   Dr. Vernon diagnosed Good with fibromyalgia.   *Id.*   In July 2011,

Good complained of tingling and numbness in her right third finger and pain everywhere.   (Tr.

311.)   Dr. Vernon noted a positive Tinel's sign[2] on the right, and diagnosed Good with carpal

tunnel syndrome, fibromyalgia, and chronic pain.   *Id.*   The EMG nerve conduction testing Good

underwent in August 2011, however, was normal.   (Tr. 323-27.)   The ALJ acknowledged that, in

April 2012, Dr. Vernon stated that Good has a "great deal of pain from fibromyalgia, and despite

several different medication trials, it has been somewhat difficult to control."   (Tr. 361.)   Dr.

Vernon also indicated that Good "has had a work-up for rheumatologic disorders and this has been

negative."   *Id.*   On March 6, 2013, Dr. Vernon referred Good to rheumatology for a second

---

[2]A sensation of tingling, or of "pins and needles," felt at the lesion site or more distally along the
course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the
nerve.   *Stedman's* at 1772.

opinion regarding her diagnosis of fibromyalgia. (Tr. 385.) Good saw rheumatologist Farhat Shereen, M.D., on April 1, 2013. (Tr. 402-04.) Upon examination, Good had no muscle tenderness, she had full muscle strength in the bilateral upper and lower extremities, and no motor weakness. (Tr. 403.) Dr. Shereen diagnosed Good with unspecified myalgia[3] and myositis,[4] unspecified pain in joint site, other malaise an fatigue, depressive disorder not elsewhere classified, unspecified degeneration of intervertebral disc site, and restless legs syndrome. *Id.* Good returned on April 11, 2013, at which time Dr. Shereen noted "fibromyalgia trigger point tenderness 18/18," but his diagnoses remained unchanged. (Tr. 406.) Dr. Shereen recommended water aerobics and smoking cessation. *Id.* He also continued medication Dr. Vernon had been prescribing for fibromyalgia. *Id.*

The ALJ discussed Good's testimony that she is able to stand for five minutes at a time and sit for thirty minutes at a time before the pain is unbearable. (Tr. 29, 73.) Good testified that she is able to walk for only fifteen to thirty minutes and cannot carry even a gallon of milk. (Tr. 29, 73-75.) Good further testified that she spends nearly all day in a recliner with a heating pad. (Tr. 31, 69, 79-80.) The ALJ concluded that Good's allegations of her limitations are significantly greater than suggested by her relatively minor impairments according to the objective evidence. (Tr. 29-30.) Specifically, the ALJ noted that Good's physical examinations do not reveal any limitations and MRIs and x-rays show age-appropriate changes with a slight disc bulge. (Tr. 31.)

While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, *Jones v. Chater,* 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the claimant's testimony and

---

[3]Muscular pain. *Stedman's* at 1265.
[4]Inflammation of a muscle. *Stedman's* at 1275.

complaints.   *See Russell v. Sullivan,* 950 F.2d 542, 545 (8th Cir. 1991); *Edwards v. Sec'y of Health & Human Servs.,* 809 F.2d 506, 508 (8th Cir. 1987).   The Court finds that the ALJ's consideration of the medical evidence upon discrediting Good's complaint of disabling pain is supported by substantial evidence and is consistent with the Regulations and case law.

The ALJ next discussed the medical evidence regarding Good's mental impairments.   (Tr. 30-31.)   The ALJ noted that Good underwent a consultative examination performed by David Lipsitz, Ph.D., on November 14, 2011.   (Tr. 333-36.)   Good complained of significant symptoms of depression, such as diminished interest in things, suicidal thoughts with no plans or intent to harm herself, and anxiety attacks.   (Tr. 30, 334.)   Good also reported episodes of binging and purging at least one to two times per day.   (Tr. 333-34.)   Upon mental status examination, Dr. Lipsitz noted Good appeared very anxious and agitated, with a flat affect, and a depressed mood. (Tr. 30, 335.)   Dr. Lipsitz diagnosed Good with major depression and anorexia nervosa/bulimia, with a GAF score of 48.[5]   *Id.*   The ALJ also noted Good's testimony that her depression causes her to isolate, she has no interest in being around other people, and she cries and does not leave the house when her depression is bad.   (Tr. 30, 75-76, 85-86.)

The ALJ pointed out that, despite Good's allegations of disabling mental impairments, there is no evidence that she received any mental health treatment.   (Tr. 30.)   The ALJ properly weighed Good's lack of mental health treatment against her in assessing her credibility.   *See Partee v. Astrue,* 638 F.3d 860, 864 (8th Cir. 2011) (recognizing that failure to seek medical treatment for mental illness is a permissible factor in determining that claimant did not suffer from a disabling mental impairment).   The ALJ acknowledged Good's testimony that limited resources

[5]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV-TR*").

prevented her from seeking treatment, yet noted that there was no evidence of emergency room visits or other efforts to receive treatment when her symptoms were severe. (Tr. 31, 64, 88.) Where there is no evidence that a claimant was ever denied medical treatment due to financial reasons, the ALJ may consider the failure to seek regular treatment in determining the claimant's credibility. *See Whitman v. Colvin,* 762 F.3d 701, 706–07 (8th Cir. 2014). In addition, there is no evidence that Good ever actively sought low-cost or free treatment. *See Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992) (ALJ properly found claimant's financial hardship was not severe enough to justify her failure to seek medical treatment when there was no evidence claimant sought to obtain any low-cost medical treatment).

The ALJ next stated that Good has a poor work history. (Tr. 31, 209-18.) A poor work history lessens a claimant's credibility. *See Fredrickson v. Barnhart,* 359 F.3d 972, 976–77 (8th Cir. 2004) (holding that claimant was properly discredited due, in part, to her sporadic work record reflecting low earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work).

Finally, the ALJ stated that the instant application is Good's fourth application for disability and she was only thirty-two years of age at her alleged onset of disability date. (Tr. 31.) The ALJ stated that Good's allegations of pain are "wildly exaggerated when compared to the objective medical record." *Id.* She found that Good's multiple previous applications combined with her relatively benign physical impairments "paints the picture of an individual focusing on obtaining disability, rather than focusing on performing work-related activities on a sustained basis at competitive levels. Financial motivation appears to be quite strong in this case." (Tr. 31-32.) The ALJ properly considered the evidence of financial motivation. *See Ramirez v. Barnhart,* 292 F.3d 576, 581 n. 4 (8th Cir.2002) (explaining that, while not dispositive itself, the

ALJ may properly consider a claimant's financial motivations in making a credibility determination).   Good's multiple applications for disability at a young age, poor work history, and Dr. Piper's remarks that Good was "going for disability" despite minimal objective findings support the ALJ's finding that the evidence of financial motivation was high.

In reviewing the record in this case, therefore, the Court is satisfied that the ALJ complied with the standards outlined in *Polaski* and did not err in finding Good's subjective allegations less than credible.

**2.      Medical Opinion Evidence**

Good argues that the ALJ failed to properly weigh the medical opinion evidence. Specifically, Good contends that the ALJ erred in assigning "no weight" to the opinion of treating physician Dr. Vernon, and "little weight" to the opinion of consultative psychologist Dr. Lipsitz.

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)).   The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."   *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir. 2000). The record, though, should be "evaluated as a whole."   *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785–86 (8th Cir. 1997)).   The ALJ is not required to rely on one doctor's opinion entirely or chose between the opinions.   *Martise v. Astrue,* 641 F .3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value.   *See Anderson v. Astrue,* 696 F.3d 790, 794

(8th Cir. 2012).   Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion.   20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty.   20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

Dr. Vernon authored two statements that the ALJ considered.   In a letter dated April 9, 2012, Dr. Vernon stated that Good has "a great deal of pain from fibromyalgia, and despite several different medication trials, it has been somewhat difficult to control.   This pain is what has been keeping her from working for a while."   (Tr. 361.)

On September 25, 2012, Dr. Vernon completed a Multiple Impairment Questionnaire, in which he listed fibromyalgia, chronic pain, depression, GERD, mild lumbar degenerative disc disease and mild cervical spine degenerative changes as diagnoses.   (Tr. 373.)   Dr. Vernon identified positive clinical findings supporting his diagnosis as multiple areas of tender points on examination consistent with fibromyalgia.   (Tr. 373.)   Dr. Vernon also noted "mild changes on MRI in 2009 and 2010."   (Tr. 374.)   Dr. Vernon expressed the opinion that, "per patient's reported abilities," Good could sit for four hours in an eight-hour workday, stand or walk for three hours, must get up every thirty minutes or so, can frequently lift up to five pounds, occasionally lift ten to twenty pounds, has moderate limitations in her ability to grasp and use her arm and fingers on the right side, and has minimal limitations in her ability to grasp and use her fingers on the left side.   (Tr. 375-77.)   Dr. Vernon also indicated that Good is incapable of even "low stress" jobs,

must take unscheduled breaks every twenty to thirty minutes, and is likely to be absent from work as a result of her impairments about two to three times a month. (Tr. 378-79.) In addition, Dr. Vernon indicated that, "per patient reports," Good needs to avoid noise, fumes, gases, temperature extremes, dust, and heights; and could not push, pull, kneel, bend, or stoop. (Tr. 379.)

The ALJ indicated that she had considered Dr. Vernon's opinions and gave them no weight. (Tr. 32.) With regard to the September 2012 Questionnaire, the ALJ stated that Dr. Vernon's opinion specifically provides that it is based on Good's subjective allegations regarding her functioning and is, therefore, "merely a regurgitation" of Good's statements. *Id.* The ALJ noted that Dr. Vernon's statement is not an opinion based on Dr. Vernon's clinical testing or observations. *Id.* A treating physician's opinion is not entitled to controlling weight when it is based, in part, on a claimant's subjective complaints. *See Renstrom,* 680 F.3d at 1064–65 (affirming where ALJ did not give controlling weight to opinion of treating doctor, where doctor's opinion was "largely based on [claimant's] subjective complaints"). In this case, Dr. Vernon clearly indicated that his findings were based on Good's subjective complaints. As such, the ALJ did not err in assigning no weight to these opinions.

The ALJ also stated that she was assigning no weight to Dr. Vernon's opinions provided in the September 2012 Questionnaire and the April 2012 letter due to the lack of a valid diagnosis of fibromyalgia. (Tr. 32.) This finding is consistent with the ALJ's determination at step two of the evaluation process that Good failed to meet the burden of establishing fibromyalgia as a medically determinable severe impairment. (Tr. 27.) As support, the ALJ noted that Dr. Vernon is an internal medicine specialist and not a rheumatologist or other musculoskeletal specialist. *Id.* The ALJ further stated that there is no clinical evidence to establish that Good actually has fibromyalgia. *Id.* The ALJ noted that, although Dr. Vernon indicated in his questionnaire that

Good has "positive tender points" on examination, his treatment notes did not document this. *Id.* The ALJ also pointed out that rheumatological testing was negative. (Tr. 32, 361.)

Social Security Ruling 12–2P provides guidance on how to evaluate fibromyalgia. SSR 12–2P (2012). A claimant has a medically determinable impairment of fibromyalgia if (1) a physician diagnoses fibromyalgia and (2) provides evidence described in Section II.A or II.B of SSR 12–2P. *Id.* at *2. Section II.A states that a person has a medically determinable impairment of fibromyalgia if she has (1) a history of widespread pain in all quadrants of the body (left, right, above, and below); (2) at least 11 positive tender points on physical examination; and (3) evidence that other disorders that could cause the symptoms or signs were excluded such as laboratory testing and imaging. *Id.* at *2–3. Section II.B requires that a person have (1) a history of widespread pain (like Section II.A); (2) repeated manifestations of six or more fibromyalgia symptoms, especially manifestations of fatigue, cognitive and memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations were excluded. *Id.* at *3. A physician's diagnosis of fibromyalgia cannot be inconsistent with the other evidence in the claimant's record. *Id.* at 2.

Good argues that the ALJ's finding that Good does not have an established diagnosis of fibromyalgia is directly contradicted by the record, as Dr. Vernon's treatment notes document multiple tender points on examination. The record reveals that Dr. Vernon saw Good on several occasions between September 2010 through April 2012. (Tr. 311-12, 314, 365.) On each of these visits, Dr. Vernon assessed fibromyalgia, but did not note any tender points on examination. *Id.* In fact, Dr. Vernon noted no abnormal musculoskeletal findings. *Id.* Instead, he noted no edema (Tr. 312, 314, 365), no atrophy/weakness (Tr. 365), and a normal gait (Tr. 365). Despite

indicating in his September 2012 questionnaire that Good had "multiple areas of tender points on exam," Dr. Vernon did not note tender points in his records until November 2012, when he stated that Good has "multiple fibromyalgia tender points; 18/18." (Tr. 394.) On March 6, 2013, Dr. Vernon stated that Good was "diffusely tender to palpation over entire body." (Tr. 384.) He did not indicate the number or location of tender points. Dr. Vernon referred Good "to rheumatology for 2nd opinion on fibromyalgia" at that time. (Tr. 385.)

At the administrative hearing, Good's attorney acknowledged that a definite diagnosis of fibromyalgia had not been established. (Tr. 60.) When the ALJ remarked that she did not see the proper evidence for a diagnosis of fibromyalgia, Good's attorney responded that Dr. Vernon had "simply mentioned that there were several tender points present. So, I agree." *Id.* Good's attorney further stated that he believed a rheumatologist should make the diagnosis. *Id.* He indicated that Good was scheduled to see a rheumatologist--Dr. Shereen--on April 1, 2013. *Id.*

As previously discussed, however, Dr. Shereen did not diagnose Good with fibromyalgia. On April 1, 2013, Dr. Shereen noted no tender points, and diagnosed myalgia and myositis, joint pain, and other malaise and fatigue. (Tr. 403.) On April 11, 2013, Dr. Shereen noted "fibromyalgia trigger point tenderness 18/18 with no muscle weakness or focal weakness" but did not change his diagnosis. (Tr. 406.) Dr. Shereen recommended water aerobics and smoking cessation. (Tr. 406.)

The ALJ's finding that Good did not have an established diagnosis of fibromyalgia is supported by substantial evidence and is consistent with SSR 12-2p. Dr. Vernon did not note any tender points on examination at the time he authored his opinions. (Tr. 403, 406.) When he subsequently noted tender points on examination, he referred her to a rheumatologist for a second opinion regarding the diagnosis of fibromyalgia. Thus, Dr. Vernon's records do not satisfy the

requirement of SSR 12-2p that other disorders had been excluded.   Similarly, Dr. Shereen never diagnosed Good with fibromyalgia, noting tender points on one examination but not the other.

The ALJ did not err in discrediting Dr. Vernon's opinion.   Dr. Vernon's September 2012 opinion was based on Good's subjective complaints.   Dr. Vernon's April 2012 statement that Good experiences a great deal of pain from fibromyalgia is similarly entitled to little weight.   The ALJ accurately noted that Dr. Vernon is not a rheumatologist and that Good does not have a valid diagnosis of fibromyalgia.   (Tr. 32.)   Dr. Vernon stated that Good's main area of pain has been her back.   (Tr. 361.)   As noted in Dr. Vernon's letter, Good's imaging has revealed only "mild disc protrusion at L4/L5, but no nerve impingement."   *Id.*   Thus, neither the objective medical evidence of record, nor Dr. Vernon's own treatment notes support Dr. Vernon's opinion that Good experiences significant pain that prevents her from working.

Good also argues that the ALJ erred in relying on the opinion of the non-examining state agency physician Jeffrey Wheeler, M.D.   Dr. Wheeler completed a Physical Residual Functional Capacity Assessment on March 22, 2012.   (Tr. 353-60.)   Dr. Wheeler expressed the opinion that Good could frequently lift ten pounds, occasionally lift twenty pounds, stand or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.   (Tr. 356.)   Dr. Wheeler also found that Good could only occasionally climb, kneel, crouch, or crawl; was limited to frequent rather than continuous fine/gross manipulation with the right upper extremity; and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.   (Tr. 357-58.)

The ALJ indicated that she was assigning "great weight" to Dr. Wheeler's opinion, as it was consistent with the medical record.   (Tr. 32.)   Good contends that the ALJ erred in relying on this opinion because Dr. Wheeler did not examine Good, and because he authored the opinion more than a year prior to the ALJ's decision.   The ALJ did not err in weighing Dr. Wheeler's

opinion.   In support of his opinion, Dr. Wheeler cited MRI evidence of a lumbar spine disc bulge, a positive Tinel's sign, normal nerve conduction study, Dr. Piper's normal neurologic examination, and the diagnosis of fibromyalgia contained in the record.   (Tr. 306.)   Good has not presented any evidence of any worsening in her condition since Dr. Wheeler reviewed the record. Thus, the ALJ did not err in assigning weight to Dr. Wheeler's opinion.   *See* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (State agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence).

Good next argues that the ALJ erred in discrediting the opinion of examining psychologist Dr. Lipsitz, and accepting the opinion of the non-examining state agency psychologist.   Dr. Lipsitz performed a consultative psychological examination on November 14, 2011, and expressed the opinion that Good had marked limitations in her activities of daily living and in her ability to maintain social functioning; and moderate deficiencies of concentration, persistence or pace.   (Tr. 337.)   The ALJ stated that Good has not sought even minimal treatment for mental impairments and is not credible, and Dr. Lipsitz relied exclusively on Good's subjective statements.   (Tr. 33.)   The ALJ indicated that she was, therefore, assigning "no weight" to Dr. Lipsitz's opinion.

Good contends that the ALJ mischaracterized the record in finding that Dr. Lipsitz's opinions were based exclusively on Good's subjective complaints.   Good accurately points out that Dr. Lipsitz conducted a mental status examination, which revealed Good was very anxious, somewhat agitated, had a flat affect and a depressed mood, recurrent suicidal ideation, some memory problems for recent events, fair insight and judgment, difficulty interpreting proverbs, and thought processes primarily preoccupied with her physical and emotional problems.   (Tr.

335.)  The undersigned agrees that the ALJ's statement that Dr. Lipsitz relied *exclusively* on the claimant's subjective statements is not accurate.  The Court further finds that this inaccuracy is harmless, as the ALJ's finding that Dr. Lipsitz's opinion was inconsistent with the record is supported by substantial evidence.

As an initial matter, while the ALJ did not set out Dr. Lipsitz's findings on examination when explaining her decision to discredit Dr. Lipsitiz's opinion, she cited many of these findings earlier in her decision when assessing Good's credibility.  (Tr. 30.)  The ALJ was therefore aware of Dr. Lipsitz's positive findings on mental status examination.  (Tr. 30.)

Despite the abnormalities Dr. Lipsitz noted, he also found that Good was oriented in all spheres, there was no evidence of any psychosis, no intent or plans to harm herself, her intellectual functioning was within the "average" range, her remote memory was good, her concentration was good, she was able to do serial threes backwards from 25 with no difficulty, she could handle minor mathematical functions, and she was able to make adequate generalizations based on past social experiences.  (Tr. 335.)  In addition, Dr. Lipsitz found that Good could handle her own financial affairs in a satisfactory manner, and that she was able to understand and remember instructions.  (Tr. 336.)  Thus, Dr. Lipsitz's findings on examination were not entirely consistent with the presence of marked limitations.  Dr. Lipsitz's opinions appear to be based, at least in part, on Good's subjective reports of restricted activities of daily living and social activities.

Dr. Lipsitz's finding that Good had marked limitations in activities of daily living and social activities is also inconsistent with Good's testimony and statements provided on her function report.  Good testified that she did not have difficulty getting along with people, but, rather, just lacked interest in social events.  (Tr. 75-76, 263.)  Good testified that she watched television all day (Tr. 70, 76), goes grocery shopping once a week (Tr. 70, 86) does light

housework and prepares simple meals (Tr. 69), spends time on the computer (Tr. 262), and sees her parents regularly (Tr. 262).

In addition, as previously discussed, Good did not receive any treatment from a mental health provider, and has offered no evidence that she attempted to obtain low-cost treatment and was denied. Good's primary care physician, Dr. Vernon, occasionally assessed mental impairments and prescribed medications. For example, on September 30, 2010, Dr. Vernon diagnosed Good with anxiety and prescribed Xanax[6] due to Good's complaints of "severe stress" related to her marriage. (Tr. 314.) At Good's next visit in December 2010, Dr. Vernon noted no mental health complaints or diagnoses. (Tr. 312.) On July 14, 2011, Dr. Vernon assessed depression and started Good on a trial of Cymbalta.[7] (Tr. 311.) On April 10, 2012, Dr. Vernon again diagnosed Good with depression, and started her on Celexa.[8] (Tr. 365.) In his April 2012 letter, Dr. Vernon stated that Good was not working due to fibromyalgia pain. (Tr. 361.) He did not reference any mental diagnoses. *Id.* Finally, Good denied depression when she saw Dr. Shereen on two occasions in April 2013. (Tr. 402, 405.) The medical evidence reveals that Good only sporadically complained of minor mental health issues to her primary care physician, and denied depression as recently as April 2013.

The ALJ properly discounted Dr. Lipsitz's opinion as inconsistent with the evidence of record. Despite discrediting Dr. Lipsitz's opinion, the ALJ incorporated significant mental limitations in Good's RFC consistent with Dr. Lipsitz's findings on examination, as will be

---

[6]Xanax is indicated for the treatment of anxiety and panic disorders. *See* WebMD, http://www.webmd.com/drugs (last visited March 15, 2016).
[7]Cymbalta is indicated for the treatment of depression and anxiety. *See* WebMD, http://www.webmd.com/drugs (last visited March 15, 2016).
[8]Celexa is indicated for the treatment of depression. *See* WebMD, http://www.webmd.com/drugs (last visited March 15, 2016).

discussed further below.   Thus, the ALJ did not commit reversible error in weighing Dr. Lipsitz's opinion.

Good also contends that the ALJ erred in assigning weight to the opinion of state agency psychologist Aine Kresheck, Ph.D..   Dr. Kresheck completed a Psychiatric Review Technique on November 30, 2011, in which she expressed the opinion that Good had moderate limitations in her ability to maintain social functioning and ability to maintain concentration, persistence, or pace; and mild limitations in her activities of daily living.   (Tr. 349.)   Dr. Kresheck also completed a Mental Residual Functional Capacity Assessment, in which she stated that Good can understand and carry out 1 to 2 step directions and make basic work-related decisions.   (Tr. 340.)   She further stated that limited social contact in the job setting might decrease job stress.   *Id.*   Finally, Dr. Kresheck found that Good can adapt to routine changes in a work environment.   *Id.*   The ALJ stated that she was assigning "some weight" to Dr. Kresheck's opinion.   (Tr. 33.)   The ALJ noted that Dr. Kresheck's opinions were somewhat inconsistent with Good's failure to receive any treatment for her mental impairments.   *Id.*

The ALJ made the following determination regarding Good's RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).   She is able to frequently perform fine and gross manipulation with [her] right upper extremity and has no limitation on her left upper extremity.   The claimant should avoid concentrated exposure to vibration.   The claimant is able to maintain focus and attention for two hour blocks of time.   She is able to occasionally interact with the public, co-workers and supervisors.   The claimant is capable of low stress work, with "low stress" defined as occasional decision-making and occasional changes in work setting.   She is capable of work requiring occasional work-related judgment.

(Tr. 28-29.)

"The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000)). *See also Anderson v. Shalala,* 51 F.3d 777 (8th Cir. 1995).

The RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. The ALJ properly weighed the opinion evidence and assessed the credibility of Good's subjective complaints. The ALJ's finding that Good could perform a limited range of light work was consistent with the imaging revealing a small disc bulge, minimal objective findings on examination, and Dr. Wheeler's opinion. The ALJ accounted for Good's positive Tinel's sign in her right wrist in limiting her to frequent fine and gross manipulation with her right upper extremity. The ALJ also indicated she had considered Good's pain complaints from unknown etiology attributed to fibromyalgia when determining Good's RFC. (Tr. 27.)

With regard to Good's mental RFC, the ALJ restricted Good's ability to maintain focus and attention to two hour blocks, limited her ability to interact with the public and co-workers, and restricted her to only low-stress work requiring only occasional work-related judgment. The ALJ obviously credited some of Good's testimony regarding isolating herself and considered Dr. Lipsitz's findings on examination in including these limitations, despite Good's lack of mental health treatment. The mental limitations found by the ALJ are consistent with the opinion of state agency psychologist Dr. Kresheck. The medical evidence of record does not support the presence of greater limitations than those found by the ALJ.

After determining Good's RFC, the ALJ found that Good was unable to perform any past relevant work. (Tr. 34.) The ALJ properly relied on the testimony of a vocational expert to find

that Good could perform other work existing in significant numbers in the national economy with her RFC, including light and unskilled jobs of electronics worker and packing line worker.   (Tr. 35, 95-97.)   *See Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations).   In fact, the hypothetical question posed to the vocational expert was slightly more restrictive than the RFC found by the ALJ.   The ALJ noted this fact in her decision, and stated that the use of the more restrictive hypothetical serves to establish that, even with greater restrictions, Good is not disabled.   (Tr. 35 n. 4.)   Thus, the ALJ's decision finding Good not disabled is supported by substantial evidence.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

**/s/** Abbie Crites-Leoni_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of March, 2016.